### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

JASON BULLOCK,
*Individually and as representative of all other individuals similarly situated*,

Plaintiff,

v.

FORD MOTOR COMPANY,

Defendant.

Case No.  2:26-cv-12335

**CLASS ACTION**

**JURY TRIAL DEMANDED**

### CLASS ACTION COMPLAINT

Plaintiff Jason Bullock, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant Ford Motor Company ("Ford" or "Defendant"). Plaintiff alleges the following upon personal knowledge as to his own purchase and experience, and upon information and belief, including counsel's investigation and review of Ford's public filings, public statements, industry reporting, and the materials provided for this action, as to all other matters.

### I. NATURE OF THE ACTION

1. This class action seeks restitution, damages, declaratory relief, and equitable relief arising from Ford's decision to pass tariff-related costs onto consumers

through higher vehicle prices while subsequently retaining, or planning to retain, the corresponding government refund or credit for itself after the tariffs were invalidated.

2.      Beginning in February 2025, the Federal Government implemented a set of sweeping tariffs imposed under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 et seq. The IEEPA tariffs affected imports from nearly all of America's trading partners across the globe. And over the course of the year the IEEPA tariffs were in effect, importers paid an estimated $182 billion in IEEPA tariff fees. Although importers and businesses initially paid the tariffs, companies ultimately passed on these tariff charges to consumers in the form of higher prices, sticking them with the bill.

3.      As a result of the IEEPA tariffs, by the end of 2025, the cost of goods in the United States had increased by more than 2% compared to 2023.[1] In dollars and cents, IEEPA tariffs cost the average American household $2,300 in 2025.[2]

---

[1] *Tracking the Economic Effects of Tariffs,* The Budget Lab, https://budgetlab.yale.edu/research/ tracking-economic-effects-tariffs (last visited July 8, 2026).
[2] *State of U.S. Tariffs: September 4, 2025*, The Budget Lab, http://budgetlab.yale.edu/research/state-us-tariffs-september-4-2025 (last visited July 8, 2026).

4.      For American vehicle buyers, the impacts of the IEEPA tariffs were even more acutely felt. As a result of the IEEPA tariffs, the costs of motor vehicles and parts increased by roughly 15%.[3] Those costs, too, were ultimately shouldered by consumers.[4]

5.      In May 2025, reporting revealed that Ford began raising prices throughout its lineup as a direct response to the IEEPA tariffs.[5] At the same time, Ford began increasing what it terms "destination fees," which further allowed it to pass IEEPA tariff costs onto consumers by increasing the *cost* of buying new vehicles without appearing to raise the *price* of the vehicles themselves.[6] For a typical new Ford vehicle, these price increases translated into hundreds or thousands of dollars in additional costs passed onto consumers.

6.      On February 20, 2026, the tariff landscape shifted once again with the Supreme Court's decision in *Learning Res., Inc. v. Trump*, 607 U.S. 229 (2026), in which it struck down the Federal Government's IEEPA tariffs. In response to *Learning Resources*,

---

[3] *State of U.S. Tariffs: SCOTUS Ruling Update*, The Budget Lab, https://budgetlab.yale.edu/research/ state-us-tariffs-scotus-ruling-update (last visited July 8, 2026).
[4] *Tariff Costs: New Car Prices Up 10% Since Last Year*, Kelley Blue Book, https://www.kbb.com/car-news/tariff-costs-new-car-prices-up-10-since-last-year/#:~:text=In%20the%20year%20since% 20the,Industry%20Insights%20at%20Cox%20Automotive (last visited July 8, 2026).
[5] *Ford hikes prices on Mexico-produced models, citing tariffs*, Reuters, https://www.reuters.com/business/ autos-transportation/ford-hikes-prices-mexico-produced-models-citing-tariffs-2025-05-07/ (last visited July 8, 2026).
[6] *Destination Fees Hit Record Hight, Ford and GM Trucks Club to $2,795*, Kelley Blue Book, https://www.kbb.com/car-news/destination-fees-hit-record-high-ford-f-150-climbs-to-2795/ (last visited July 8, 2026).

in April 2026, U.S. Customs and Border Protection began implementing a process through which importers of record could request a refund of IEEPA tariffs, including interest thereon.[7] Included among the companies set to receive a refund of the tariffs is Ford, which had already passed along the cost of the now-illegal fees onto its consumers.

7.      But Ford has made it clear that, even after it receives a full refund of these unlawfully charged fees, it has not returned, and does not intend to return, them to the consumers who paid them. According to publicly filed financial disclosures, Ford is poised to receive a windfall from IEEPA tariff refunds. In its Quarterly Report on Form 10-Q for the quarter ending March 31, 2026, Ford stated that its 2026 outlook assumed a $1.3 billion adjusted EBIT benefit from IEEPA.[8]

8.      Ford's 10-Q and related public disclosures make clear that Ford intends to use the IEEPA benefit and other cash benefits for Ford's own corporate purposes— including capital spending, production recovery, electric-vehicle and battery-related

---

[7] *IEEPA Duty Refunds and CAPE (April 2026)*, U.S. Customs and Border Protection, https://www.cbp.gov/sites/default/files/2026-04/webinar_ieepa_refunds_overview_4.17.pdf (last visited July 8, 2026).

[8] SEC Filing, Form 10-Q, Ford Motor Company (quarterly period ending March 31, 2026), https://d18rn0p25nwr6d.cloudfront.net/CIK-0000037996/79e74378-1d7d-4dfa-9357-065ad542df19.pdf (last visited July 8, 2026).

projects, and other enterprise initiatives—rather than returning the tariff-derived overcharges to the consumers who bore them.[9]

9.      Ford therefore seeks to keep both sides of the transaction: first, the tariff-driven price increase paid by consumers; and second, the government refund, credit, or economic benefit corresponding to those same tariff charges. However, if Ford retains the IEEPA refund while also retaining the tariff-related price increases paid by consumers, Ford will receive a double recovery and unjust windfall. Equity does not permit that windfall.

10.      Mr. Bullock brings this action to require Ford to disgorge and restore the tariff-related amounts it passed through to consumers, to prevent Ford from retaining the $1.3 billion IEEPA-related benefit at consumers' expense, and to obtain all other relief available by law.

## II. PARTIES

11.      Plaintiff Jason Bullock is a natural person and citizen of California residing in San Diego, California.

12.      On or around February 21, 2026, Mr. Bullock purchased a new model year 2025 Ford Mustang Mach-E from Mossy Ford, an authorized Ford dealer, located in San Diego, California.

---

[9] *Ford Reports First-Quarter 2026 Financial Results; Raises Full-Year Guidance*, Ford News, https://s205.q4cdn.com/882619693/files/doc_financials/2026/q1/Ford-Q1-2026-Press-Release.pdf (last visited July 8, 2026).

13.     Mr. Bullock paid a price that reflected Ford's tariff-driven price increase. Had Ford not passed the unlawful IEEPA tariff costs through to consumers, Mr. Bullock would have paid less for his vehicle.

14.     Mr. Bullock has not received any refund, credit, rebate, or other reimbursement from Ford for the tariff-related amount the company embedded in the purchase or lease price of his vehicle.

15.     Ford is a Delaware corporation with its principal executive offices at One American Road, Dearborn, Michigan 48126.

16.     Ford designs, manufactures, imports, distributes, prices, markets, and sells Ford-branded vehicles throughout the United States, including through an authorized dealer network. Ford sets or materially influences manufacturer suggested retail prices, destination charges, wholesale prices, incentives, rebates, allocations, and other pricing inputs that affect the transaction prices paid by consumers.

17.     Ford conducts substantial business in this District, is headquartered in this District, made or approved the challenged pricing and refund-retention decisions in this District, and received or will receive the challenged IEEPA-related benefit in this District.

### III. JURISDICTION AND VENUE

18.     This Court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this action is a proposed class action in which at least

one Class member is a citizen of a state different from Defendant, the proposed Class contains more than 100 members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

19. This Court also has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 2201 to the extent Plaintiff seeks declaratory relief relating to the legal consequences of tariffs imposed under federal law, refunds or credits arising from federal customs collections, and Ford's retention of the IEEPA-related benefit.

20. This Court has personal jurisdiction over Ford because Ford is headquartered in Michigan, maintains its principal executive offices in this District, conducts continuous and systematic business here, and the challenged corporate decisions were made, approved, implemented, or ratified in substantial part from this District.

21. Venue is proper in this District under 28 U.S.C. § 1391(b) because Ford resides in this District, a substantial part of the events or omissions giving rise to the claims occurred in this District, and Ford's challenged retention of the tariff-related benefit occurred or will occur in this District.

22. Assignment to the Southern Division is appropriate because Ford's principal place of business is in Dearborn, Wayne County, Michigan, and the claims arise from conduct centered in that location.

## IV. FACTUAL ALLEGATIONS

### A.    The IEEPA Tariffs and Their Invalidation.

23.    Beginning in February 2025, the federal government imposed a set of sweeping tariffs under the asserted authority of IEEPA. Those tariffs applied to nearly all of the United States's trading partners and covered numerous imports, including imported vehicles, vehicle parts, components, steel, aluminum, batteries, electronics, and other inputs used in or associated with automobiles sold in the United States.

24.    Importers of record, including vehicle manufacturers and related entities, paid IEEPA tariffs to U.S. Customs and Border Protection when covered goods entered the United States.

25.    As a matter of economic reality, importers could absorb tariff costs, pass them through to consumers in the form of higher prices, or use a combination of both strategies.

26.    Ford publicly acknowledged that tariffs imposed substantial costs on the company and that it would pass on much of those costs to its consumers.[10] Public

---

[10] *Ford hikes prices on Mexico-produced models, citing tariffs,* Reuters, https://www.reuters.com/business/autos-transportation/ford-hikes-prices-mexico-produced-models-citing-tariffs-2025-05-07/ (last visited July 8, 2026).

reporting in May 2025 reflected that Ford expected tariffs to cost it approximately $1.5 billion for 2025.[11]

27.     On February 20, 2026, the Supreme Court ruled that tariffs imposed under IEEPA were unlawful. *See Learning Res., Inc. v. Trump*, 607 U.S. 229 (2026).

28.     That ruling created, confirmed, and accelerated importers' ability to obtain refunds, credits, offsets, or other economic benefits for IEEPA tariffs previously paid. Consumers, however, cannot obtain tariff refunds directly from U.S. Customs because they were not the importers of record.

29.     Consumers who paid tariff-inflated prices therefore depend on the importer or manufacturer that receives the refund, credit, or benefit to return the corresponding overcharge or otherwise credit consumers.

**B.     Ford Passed IEEPA Tariff Costs Through to Consumers.**

30.     Ford did not merely absorb IEEPA tariff costs. Instead, Ford increased prices on affected vehicles and publicly tied those price increases to tariffs.

31.     Public reporting stated that Ford would raise prices on at least three Mexico-built models—the Bronco Sport, Maverick, and Mustang Mach-E—beginning July 5, 2025, as a result of tariffs. Plaintiff cites those reported model-specific increases

---

[11] *Ford pulls guidance, warns it will take $1.5 billion hit from Trump's tariffs,* Reuters, https://www.reuters.com/business/autos-transportation/ford-pulls-guidance-warns-it-will-take-15-billion-hit-trumps-tariffs-2025-05-05/ (last visited July 8, 2026).

as illustrative examples and contemporaneous admissions of Ford's tariff pass-through, not as a limitation on the vehicles included in this action.[12]

32.     While Ford's Mexico-built vehicles were directly exposed to tariffs on goods imported from Mexico, and Ford's reported pricing actions followed the imposition of those tariffs, Ford's broader vehicle lineup was also exposed to IEEPA tariff costs. These costs came in the form of imported vehicles, imported parts and components, steel, aluminum, batteries, electronics, and other inputs, which Ford incorporated into prices across all new Ford vehicles during the Class Period. And while Ford explicitly increased the price of certain models, which it directly attributed to the cost of tariffs, it simultaneously increased "destination charges" across its vehicle lineup—allowing it to pass along tariff costs to consumers without appearing to increase vehicle prices.[13]

33.     Ford's tariff-driven increases cost new vehicle purchasers anywhere from hundreds to thousands of dollars, amounts material to reasonable consumers purchasing or leasing new vehicles.

---

[12] *Ford hikes prices on Mexico-produced models, citing tariffs,* Reuters, https://www.reuters.com/business/autos-transportation/ford-hikes-prices-mexico-produced-models-citing-tariffs-2025-05-07/ (last visited July 8, 2026).

[13] *Destination Fees Hit Record High, Ford and GM Trucks Climb to $2,795,* Kelley Blue Book, https://www.kbb.com/car-news/destination-fees-hit-record-high-ford-f-150-climbs-to-2795/ (last visited July 8, 2026).

34.     Ford's price increases were implemented across all new Ford vehicles through Ford's centralized pricing, wholesale, invoice, MSRP, destination-charge, incentive, rebate and other systems, and were therefore common to the proposed Class.

35.     Ford's tariff-related pricing decisions materially increased the price paid by consumers.

36.     Plaintiff (and consumers) purchased or leased an affected Ford vehicle after Ford implemented its tariff-driven price increases and paid a price that included the tariff-related increase.

## C.     Ford Expects a $1.3 Billion IEEPA Benefit But Does Not Intend to Pass It Back to Consumers.

37.     Ford's Form 10-Q for the quarter ended March 31, 2026 states that Ford's outlook for 2026 assumes a "$1.3 billion adjusted EBIT benefit of IEEPA," with no adjusted free cash flow benefit until 2027.[14]

38.     The same 10-Q states that Ford's outlook assumes "Flat U.S. industry pricing"—meaning Ford does not plan a consumer-facing price reduction commensurate with the IEEPA benefit—and does not mention any plan to refund, credit, or otherwise return tariff-derived overcharges to consumers who paid higher prices because of IEEPA tariffs.

---

[14] SEC Filing, Form 10-Q, Ford Motor Company (quarterly period ending March 31, 2026), https://d18rn0p25nwr6d.cloudfront.net/CIK-0000037996/79e74378-1d7d-4dfa-9357-065ad542df19.pdf (last visited July 8, 2026).

39. Instead, in its press release attendant to its Q1 2026 10-Q, Ford unequivocally stated that the "$1.3 billion one-time IEEPA tariff benefit… [will be] primarily benefitting the Ford Blue and Ford Pro segments" and not returned to consumers. *See* Footnote 9, p. 2, supra.

40. Furthermore, Ford's public disclosures discuss corporate uses of cash and expected benefits, including the IEEPA benefit, on things like capital spending, recovery from supplier disruptions, segment-level profitability, and continued investments in vehicle platforms, electric-vehicle strategy, battery-related projects, and other corporate initiatives.

41. Ford's 10-Q also reports billions of dollars in capital spending and other investing activities, underscoring that Ford intends to deploy corporate cash and benefits for Ford's own operations and strategic projects.

42. In short, Ford unequivocally intends to retain the IEEPA-related $1.3 billion benefit and use it for Ford's own projects, balance-sheet objectives, operations, production recovery, capital expenditures, and strategic initiatives, rather than pass that benefit back to the consumers who paid tariff-inflated prices.

43. Ford's retention of the IEEPA-related benefit is inequitable because the benefit corresponds to tariff costs that Ford already shifted, in whole or in part, to consumers through higher vehicle prices.

44. If Ford retains the IEEPA benefit while also retaining the tariff-related price increases paid by consumers, Ford will receive a double recovery and unjust windfall.

**D. Plaintiff and Class Members Were Injured.**

45. Plaintiff and Class members paid more for affected Ford vehicles than they would have paid absent Ford's tariff-driven price increases.

46. The injury is measurable on a classwide basis using Ford's pricing records, MSRP adjustments, invoice data, wholesale price changes, destination charges, incentive and rebate data, dealer communications, import records, customs refund or credit records, and transaction data.

47. The amount of Ford's tariff pass-through can be calculated by comparing affected models and pricing periods before and after the tariff-related increases, including Ford's documented price increases, and by allocating Ford's IEEPA refunds, credits, offsets, or adjusted EBIT benefit to the vehicles and consumers that bore those costs through, upon information and belief, Ford's own internal records.

48. Plaintiff and Class members lack an adequate remedy directly against the federal government because they were not the importers of record and did not pay the tariffs directly to U.S. Customs.

49. Ford, by contrast, is positioned to receive, retain, allocate, account for, and distribute the IEEPA-related benefit. Equity requires Ford to restore to consumers

the portion of the benefit corresponding to the tariff-driven overcharges consumers paid.

## V. CLASS ALLEGATIONS

50.     Plaintiff brings this action under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of the following Nationwide Class:

> All persons in the United States who purchased or leased a new Ford vehicle during the Class Period and paid a price that included a Ford-imposed price increase attributable, in whole or in part, to IEEPA tariffs.

51.     Plaintiff pleads the Nationwide Class under common principles of restitution, unjust enrichment, money had and received, declaratory relief, equitable relief, and injunctive relief. Michigan law applies nationwide because Ford is headquartered in Michigan and the challenged corporate pricing, disclosure, refund-retention, accounting, and treasury decisions were made, approved, implemented, or ratified from Michigan.

52.     Mr. Bullock also seeks certification of the following California Subclass:

> All persons in California who purchased or leased a new Ford vehicle during the Class Period and paid a price that included a Ford-imposed price increase attributable, in whole or in part, to IEEPA tariffs.

53.     The "Class Period" begins February 1, 2025, and continues through the date Ford refunds, credits, disgorges, or is ordered to restore the tariff-related overcharges to consumers, or such other period as discovery shows is appropriate.

54. Excluded from the Classes are Ford; Ford's officers, directors, employees, subsidiaries, affiliates, and legal representatives; Ford dealers to the extent they purchased vehicles solely for resale and not for personal or fleet use; governmental entities; the Court and its staff; and any person who timely and validly opts out of a Rule 23(b)(3) class.

55. The Classes are so numerous that joinder is impracticable. Ford sells hundreds of thousands of vehicles annually in the United States, including large numbers of affected models, and the Classes likely include thousands or tens of thousands of consumers.

56. Common questions of law and fact predominate, including whether Ford imposed tariff-driven price increases; whether Ford passed IEEPA tariff costs to consumers; whether Ford expects a $1.3 billion IEEPA benefit; whether Ford intends to retain that benefit rather than return it to consumers; whether Michigan law applies to Ford's Michigan-centered pricing and refund-retention conduct; whether Ford's retention is unjust, unfair, deceptive, or unlawful; and the proper measure of restitution, disgorgement, damages, and declaratory relief.

57. Plaintiff's claims are typical of the Classes because Plaintiff purchased an affected Ford vehicle, paid a tariff-inflated price, and seeks the same relief arising from the same course of Ford conduct as the Classes.

15

58.     Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff has no interests antagonistic to the Classes and has retained counsel experienced in complex consumer and class litigation.

59.     Class treatment is superior to individual litigation because the tariff-related overcharge for any single consumer is relatively small compared to the cost of individual litigation, while Ford's aggregate retention is substantial.

60.     Certification under Rule 23(b)(2) is also appropriate because Ford has acted or refused to act on grounds generally applicable to the Classes, making declaratory and injunctive relief appropriate respecting the Classes as a whole.

61.     Class members are ascertainable through objective records, including Ford's sales, distribution, pricing, warranty-registration, connected-services, incentive, rebate, and dealer records; lease records; state title and registration data; and consumer transaction documents.

## VI. CLAIMS FOR RELIEF

### COUNT I

### DECLARATORY JUDGMENT (28 U.S.C. §§ 2201–2202)

62.     Plaintiff incorporates by reference all preceding paragraphs.

63.     An actual controversy exists between Plaintiff and the Classes, on the one hand, and Ford, on the other, concerning Ford's right to retain tariff-related price increases and the corresponding IEEPA refunds, credits, offsets, or economic benefits.

64.     Plaintiff and the Classes contend that Ford has no legal or equitable right to retain the portion of any IEEPA-related benefit corresponding to tariff costs Ford passed through to consumers with increased prices on its vehicles.

65.     Ford's conduct and public disclosures indicate that Ford disclaims any obligation to return those amounts to consumers and intends to retain and use the IEEPA benefit for Ford's own corporate purposes.

66.     Plaintiff seeks a declaration that Ford must account for, escrow, disgorge, refund, credit, or otherwise restore to consumers the tariff-related amounts it passed through to them and may not retain a double recovery from the same tariff costs.

## COUNT II

## UNJUST ENRICHMENT / RESTITUTION

### On behalf of the Nationwide Class and the California Subclass

67.     Plaintiff incorporates by reference all preceding paragraphs.

68.     Ford received a benefit from Plaintiff and Class members in the form of tariff-inflated vehicle prices.

69.     Ford also subsequently received, expects to receive, or recognized or will recognize, a $1.3 billion IEEPA-related benefit corresponding to tariffs whose costs Ford passed through in whole or in part to consumers.

70.     Plaintiff and Class members conferred these benefits on Ford.

71. Ford appreciated and knowingly accepted the benefits. Ford publicly recognized the tariff impact, implemented tariff-driven price increases, disclosed the expected IEEPA benefit in its 10-Q, and has made the affirmative and continuing choice to retain this economic benefit conferred upon it by Plaintiff and the members of the Classes.

72. It would be inequitable for Ford to retain the tariff-related overcharges and the corresponding IEEPA benefit without restoring the overcharges to Plaintiff and Class members.

73. Plaintiff and the Classes are entitled to restitution, disgorgement, constructive trust, equitable lien, and all other equitable relief necessary to prevent Ford's unjust enrichment.

## COUNT III

## MONEY HAD AND RECEIVED

### On behalf of the Nationwide Class and the California Subclass

74. Plaintiff incorporates by reference all preceding paragraphs.

75. Ford has received money, or its equivalent, that in equity and good conscience belongs to Plaintiff and Class members.

76. The money includes tariff-related price increases paid by consumers and the corresponding IEEPA refund, credit, offset, or economic benefit that Ford expects to retain.

77.     Ford's continued retention of those funds would be unjust because the underlying tariffs were unlawful and Ford already shifted the tariff burden to consumers.

78.     Plaintiff and Class members are entitled to recover the money Ford had and received for their benefit, in an amount to be proven at trial.

## COUNT IV

## CONVERSION

### On behalf of the Nationwide Class and the California Subclass

79.     Plaintiff incorporates by reference all preceding paragraphs.

80.     To the extent Ford receives identifiable refunds, credits, offsets, or funds corresponding to IEEPA tariffs whose costs Ford passed through to Plaintiff and Class members, those specific funds or proceeds belong equitably to Plaintiff and Class members.

81.     Ford has exercised dominion and control over those identifiable funds or proceeds by retaining them, recognizing them as Ford's own economic benefit, and intending to use them for Ford's own projects rather than returning them to consumers.

82.     Ford's dominion and control is wrongful to the extent it exceeds Ford's right to retain only amounts Ford absorbed and did not pass through to consumers.

83.     Plaintiff and Class members are entitled to damages, restitution, and all other relief available for conversion of identifiable refund proceeds.

## COUNT V

## INJUNCTIVE RELIEF

### On behalf of the Nationwide Class and the California Subclass

84.   Plaintiff incorporates by reference all preceding paragraphs.

85.   Ford's ongoing and threatened future retention and use of the IEEPA benefit for its own corporate projects will cause ongoing and irreparable harm by dissipating funds that should be restored to consumers and by making later restitution more difficult.

86.   Plaintiff seeks an injunction requiring Ford to preserve, account for, and segregate the portion of any IEEPA-related refund, credit, offset, or benefit corresponding to tariff costs passed through to consumers; to cease representing those amounts as Ford's unrestricted corporate funds; and to implement a Court-approved refund or credit program for affected consumers.

87.   The balance of equities favors injunctive relief because Ford has no legitimate interest in retaining a double recovery, while consumers have a strong equitable interest in restoration of tariff-related overcharges.

88.   An injunction serves the public interest by preventing retention of unlawful tariff pass-throughs and ensuring that refunds or credits corresponding to consumer-paid charges are returned to the consumers who bore them.

## VII. PRAYER FOR RELIEF

A. Certifying this action as a class action under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3);

B. Appointing Plaintiff Jason Bullock as Class representative and appointing Plaintiff's counsel as Class counsel;

C. Declaring that Ford may not retain tariff-related overcharges and corresponding IEEPA refunds, credits, offsets, or economic benefits to the extent Ford passed those tariff costs through to consumers;

D. Ordering Ford to provide a complete accounting of IEEPA tariff costs, price increases, refunds, credits, offsets, adjusted EBIT benefits, and related uses of funds;

E. Ordering restitution, disgorgement, refund, credit, constructive trust, equitable lien, escrow, or other equitable relief requiring Ford to restore tariff-related overcharges to Plaintiff and Class members;

F. Awarding compensatory damages, actual damages, statutory damages, treble damages where authorized, and all other damages available by law;

G. Enjoining Ford from dissipating, concealing, transferring, or using tariff-related refunds, credits, offsets, or benefits for non-consumer purposes until the Court determines the portion owed to consumers;

H. Awarding pre-judgment and post-judgment interest;

I.  Awarding attorneys' fees and costs as authorized by law, including equitable common-fund or substantial-benefit principles;

J.  Ordering such other and further relief as the Court deems just and proper.

## VIII. DEMAND FOR JURY TRIAL

89.  Plaintiff demands a trial by jury on all issues so triable.

Date: July 9, 2026

Respectfully submitted,

*/s/ Hassan A. Zavareei*
Hassan A. Zavareei* (DC Bar No. 456161)
hzavareei@tzlegal.com
Troy Brown** (DC Bar No. 90039295)
tbrown@tzlegal.com
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Ave NW, Suite 1010,
Washington, D.C. 20006
Telephone: (202) 973-0900
Facsimile: (202) 973-0950

Frank A. Bartela** (OH Bar No. 0088128)
fbartela@tzlegal.com
Patrick J. Brickman** (OH Bar No. 0088524)
pbrickman@tzlegal.com
**TYCKO & ZAVAREEI LLP**
2515 Jay Ave, First Floor

Cleveland, OH 44113
Telephone: (216) 423-6599

*Counsel for Plaintiff and the Proposed Classes*

*\*Admitted to practice in the Eastern District of Michigan*
*\*\*Pro Hac Vice Forthcoming*

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

Eastern District of Michigan

| | |
|---|---|
| JASON BULLOCK,<br>Individually and as representative of all other<br>individuals similarly situated<br><br>_____<br>*Plaintiff(s)*<br><br>v.<br><br>FORD MOTOR COMPANY<br><br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No.  2:26-cv-12335 |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Ford Motor Company
C/O The Corporation Company
40600 Ann Arbor Rd. E
Ste 201
Plymouth, MI 48170

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Hassan A. Zavareei
Tycko & Zavareei LLP
2000 Pennsylvania Ave. NW
Suite 1010
Washington, D.C. 20006

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*